2019V00585/DC/SD/fk

CRAIG CARPENITO
UNITED STATES ATTORNEY
BY:  SARAH A. DEVLIN
ASSISTANT UNITED STATES ATTORNEYS
970 BROAD STREET, SUITE 700
NEWARK, NEW JERSEY 07102
TEL: (973) 645-2740
FAX: (973) 297.2042
sarah.devlin3@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Hon.** |
| **Plaintiff,** | : | **Civil Action No.** |
| **v.** | | |
| **$35,400.00 IN UNITED STATES CURRENCY,** | : | **VERIFIED COMPLAINT FOR FORFEITURE _IN REM_** |
| | : | |
| **Defendant _in rem._** | : | |
| | : | |

Plaintiff the United States of America, by its attorney, Craig Carpentio, United States Attorney for the District of New Jersey, for its verified complaint (the "Complaint") alleges, upon information and belief, as follows:

### NATURE OF THE ACTION

1.     This action is brought by the United States of America seeking the forfeiture of a total of approximately $35,400.00 in United States currency seized from 199 Dorado Avenue in Sewell, New Jersey on or about April 17, 2019 (hereinafter referred to as the "Defendant _in rem_" or the "Defendant Property").

2.     The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and  984, as property, real or personal, that constitutes

or is derived from proceeds traceable to mail fraud in violation of 18 U.S.C. §
1341, and wire fraud, in violation of 18 U.S.C. § 1343, which are offenses
constituting specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7),
and conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. §
1349.

3.     The Defendant Property is subject to forfeiture pursuant to 18
U.S.C. § 981, and 18 U.S.C. § 981 and 28 U.S.C. § 2461, by 18 U.S.C. § 981(b).

## THE DEFENDANT IN REM

4.     The Defendant Property consists of $35,400.00 in United States
currency which was seized on or about April 17, 2019 during the execution of a
search warrant issued in the District of New Jersey on April 15, 2019.
Approximately $35,400.00 in United States currency was seized from William
O'Hanlon, Karen Stefanowski and Harold O'Hanlon's residence located at 199
Dorado Avenue, Sewell, New Jersey 08080 ("199 Dorado Avenue").

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C.
§§ 1345 and 1355(a).

6.     Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts
and omissions giving rise to the forfeiture occurred in the District of New
Jersey.

7.     The Defendant Property is being held on deposit by the United
States Marshals Service ("USMS") for the District of New Jersey in the USMS

Seized Asset Deposit Fund account at the Federal Reserve Bank, New York, New York.

## FACTS

### OVERVIEW OF THE CONSPIRACY

8.     The Federal Bureau of Investigation ("FBI") is investigating an advance fee scheme conducted by William O' Hanlon and Karen Stefanowski (the "co-conspirators").  The co-conspirators sought to defraud timeshare owners by 1) representing that their business, Williams Andrews Burns, LLC ("WAB"), could provide renters for the timeshare owner's timeshares, 2) causing victims to transfer money to bank accounts controlled by WAB for WAB's purported services, and 3) not providing the timeshare owners with the services they promised to provide.  At all times relevant to this Complaint:

   a. William Andrews Burns, LLC ("WAB") is a limited liability company incorporated in the state of New Jersey that offers various services, including credit repair, unclaimed funds collection, and timeshare rental services.

   b. William O'Hanlon ("O'Hanlon") is the owner and manager of WAB, and is responsible for the management of WAB and its employees, operations, expenditures, and billing.

   c. Karen Stefanowski ("Stefanowski") is O'Hanlon's wife, who performs administrative and financial duties for WAB.

   d. Harold O'Hanlon ("Harold"), is William O'Hanlon's elderly father.

### ACTS IN FURTHERANCE OF THE CONSPIRACY

9.     Beginning in or about October 2016 and continuing through 2019, O'Hanlon, through WAB, directed WAB's employees to place telephone calls to timeshare owners, who were usually elderly individuals, offering to secure

renters for the timeshare owners' timeshares in return for a fee.  O'Hanlon drafted a script for WAB's employees to use when speaking to timeshare owners via telephone.  During such phone calls, O'Hanlon and his employees promised the timeshare owners that the rents the timeshare owners would receive as a result of using WAB to secure renters would exceed the fees that WAB charged for its services.

10.    WAB had multiple offices, including one located at 1117 N. Black Horse Pike, Williamstown, New Jersey ("1117 N. Black Horse Pike").  1117 N. Black Horse Pike functioned as the sales office for WAB, from which salespersons known as "fronters" cold-called various timeshare owners to offer to rent or sell the owners' timeshare.  O'Hanlon directed that WAB employees use aliases to conceal their true identities when talking to the timeshare holders.

11.    After the fronter made contact with a timeshare owner who seemed interested in having his or her timeshare rented by WAB, the fronter passed the timeshare owner onto a "closer."  A closer is a WAB salesperson who confirmed the timeshare owner's contact information and obtained financial information from the timeshare owner.  Such financial information typically included the timeshare owner's bank account number and bank routing number, along with authorization for WAB to draw funds from the timeshare owner's bank account.

12.    O'Hanlon obtained the names and contact information of the timeshare owners that WAB contacted from various individuals, including

-4-

O'Hanlon's co-conspirator William Chuisano ("Chuisano"), who operated WAB's office in Laguna Niguel, California. Chuisano forwarded contact information for the timeshare owners via email to WAB's employees on a form called a "lead sheet."

13.   O'Hanlon also received leads for potential clients by placing an advertisement on Craigslist.   Individuals who used to work in the timeshare industry and had "stolen" client lists from their previous employers responded to the advertisement.

14.   The lead sheets with notes written by WAB employees were eventually transported either physically or electronically to 199 Dorado Avenue, Sewell, New Jersey, which was O'Hanlon, Stefanowski, and Harold's residence and another of WAB's office.  Stefanowski typically contacted the timeshare owner to confirm the timeshare owner's banking information, and created a check payable to WAB for the amount the fronter and the timeshare owner agreed the timeshare owner would pay during the phone conversation.  The check was drawn on the victim's account.

15.   Stefanowski prepared drafts or checks drawn on the timeshare owners' bank accounts using the financial information provided by the victims. The memo lines of the checks or drafts that Stefanowski prepared often read: "On Tape Verified w/[Employee Name] Lic#XXXX 888-730-6260", and the signature lines on the checks or drafts the Stefanowski prepared often read: "This draft authorized by your depositor, No Signature Required."  Stefanowski then deposited those check into WAB bank accounts.   Sometimes, the victims'

banks would not honor the checks that Stefanowski prepared. Based on a review of bank records between in or about October 2016 and April 15, 2019, timeshare owners have paid approximately $3,124,922 to WAB to rent or sell their timeshares during the review period.

16.     In addition, after timeshare owners had paid WAB to obtain renters for their timeshares collections employees at WAB's 199 Dorado Avenue office contacted them and asked if they had paid other companies to rent their timeshares.  If the timeshare owner indicated that he or she lost money to another company to rent his or her timeshare, the WAB employee offered, in return for a flat fee or a percentage, to attempt to obtain refunds from the other rental company on behalf of the timeshare owner. The flat fee or percentage was based upon what the timeshare holder had paid the other rental company.

**WITNESSES 1 AND 2 – EMPLOYEES OF WAB**

17.     Witness 1 and witness 2, both of whom are former WAB employees, described WAB's business functions to law enforcement.

18.     Witness 1 explained that WAB's timeshare scheme worked as follows:

> a.  An employee from WAB's sales office located at 1117 N. Black Horse Pike contacted a client with an offer to rent the client's timeshare, explaining that there was an upcoming event in the area, for example, a flower show, which would draw in potential renters.
>
> b.  The sales employee offered the client increased rental income from the timeshare within two or three weeks of the event or a refund within 180 days if the timeshare was not rented.
>
> c.  Client conversations with sales or collections employees were generally not recorded.

   d. The client was required to pay an upfront fee to WAB in order to secure WAB's services to rent the timeshare.

   e. WAB had no intention of actually renting the client's timeshares or providing the clients with refunds for failing to rent the timeshare.

   f. Instead, WAB offered other services to its clients in order to continue obtaining monies from its clients, including, by offering credit repair services and unclaimed funds collection.

   g. Much of the information on WAB's website was fraudulent, including the testimonials referencing the dollar amounts employees allegedly recovered for clients.

19.    Witness 1 explained that Stefanowski assisted O'Hanlon with the day-to-day operation and management of WAB, specifically:

   a. Stefanowski corresponded with WAB's clients using O'Hanlon's name and e-mail address.

   b. In O'Hanlon's absence, Stefanowski provided direction to employees in the collection department located at 199 Dorado Avenue.

   c. Stefanowski typically printed checks using the clients' bank account information which had been previously provided by the client, to transfer money from clients' bank accounts to WAB bank accounts. While doing so, Stefanowski often entered a notation in the memo section of the check indicating that the client had given authorization for the issuance of the check in order to lend an air of legitimacy to the checks.

   d. Witness 1 observed O'Hanlon and Stefanowski argue about the direction of WAB, at which time Stefanowski told O'Hanlon that she was tired of ripping people off.

20.    Witness 2 similarly stated that WAB had numerous employees, including approximately eight "fronters" and ten "closers" who work in WAB's 1117 N. Black Horse Pike office. WAB also employed approximately three "fee recovery specialists" or "collectors" who worked in the basement of 199 Dorado Avenue. Fronters were given the leads to cold call timeshare owners. The

fronters were required to follow a script during the cold calls.  The fronters tried to convince timeshare owners to pay WAB to rent their timeshare in exchange for a fee with a guarantee their timeshares would be rented or they would receive a full refund after 180 days.  If the timeshare owners expressed interest in the offer, the fronters passed those timeshare owners onto the closers to finalize the sale.  Once the "closer" verified that the timeshare owners were interested in utilizing WAB's services, and verified how much the timeshare owner would pay WAB for its services, the client was passed onto William O'Hanlon or Karen Stefanowski, who talked to the client.  Typically, Karen Stefanowski took bank information from the client and produced a check to deduct the fees from the client's account.  The clients were made aware that Stefanowski was producing the check to deduct fees from their accounts.

21.    Witness 2 told law enforcement that WAB did not make any real efforts to rent timeshares as advertised to clients.

22.    According to Witness 1 and Witness 2, WAB did not have any employees who had the responsibility of finding renters for timeshare owners or arranging to buy timeshare owners out.  The only jobs at WAB were closer, collector, and fronter.

23.    According to Witness 1, workers in the collections department were paid an hourly rate in cash under the table and also received a commission for each credit collection or timeshare client they signed up.  Witness 1 further stated that WAB has not withheld any wage taxes from its employees' paychecks.

-8-

24.    Review of bank records for accounts held by WAB corroborate statements made by former employees, as a review of WAB and O'Hanlon's bank accounts reveals that there were no transactions or deposits for renting timeshares or payments to anybody for the timeshare rentals.

25.    Witness 2 told law enforcement that O'Hanlon's neighbors at 199 Dorado Avenue had called the police several times to report that a business was operating out of the residence.  As a result, in or about August 2018, O'Hanlon made his collector employees sign agreements falsely stating that they were being paid to be caretakers for Harold O'Hanlon.

26.    Witness 1 told law enforcement that Harold O'Hanlon was not involved with WAB's business in any way.  However, public records show that WAB was incorporated with the state of New Jersey in Harold O'Hanlon's name.  Based upon the investigation, including the information summarized herein, O'Hanlon appears to have attempted to disguise his involvement in the creation and operation of WAB.  Witness 1 told law enforcement that O'Hanlon uses his father Harold's social security number in an effort to shield O'Hanlon's personal finances from civil and criminal liability.  Witness 2 also told law enforcement that O'Hanlon created WAB in Harold's name in an attempt to avoid civil and criminal liability and he believed Harold would be dead by the time law enforcement detected the scheme being conducted by WAB.  During the execution of the search warrant at his residence, O'Hanlon told law enforcement agents that he started WAB.

27.     Witness 2 believes O'Hanlon and Stefanowski have deleted particularly incriminating WAB files from the WAB computer system, known as ACT!, a customer relationship management software application.  Witness 2 told law enforcement that notes he or she prepared and saved in the WAB computer system have disappeared.  When confronted about the missing files, O'Hanlon claimed that ACT had "dropped" the files.

28.     On or about January 23, 2019, O'Hanlon instructed the employees of the 1117 N. Black Horse Pike office to lie to authorities in the event WAB was ever audited.

29.     Law enforcement officers have interviewed numerous victims of WAB's advance fee scheme.  Furthermore, law enforcement officers have sent out questionnaires about WAB's services to all known victims of WAB's scheme, and have received completed questionnaires from hundreds of WAB's victims.  The victims whom law enforcement officers interviewed, along with the respondents to the questionnaires generally told law enforcement that WAB did not render any services in exchange for the victims' payments to WAB.  Law enforcement officers estimate there are approximately 2,000 total victims of WAB's timeshare and collections schemes.

30.     Witness 2 stated that O'Hanlon has made statements claiming to have $90,000 in cash stored at 199 Dorado Avenue.  Witness 2 did not know where O'Hanlon stored the cash he kept at 199 Dorado Avenue.

**WITNESSES 3 AND 4 - VICTIMS**

31.    During the course of the investigation, law enforcement officers also interviewed Witness 3 and Witness 4, who stated the following, in substance and in part.  On or about August 4, 2017, Witness 3 received an unsolicited telephone call from a female employee of WAB.  The employee explained to Witness 3 that WAB worked to rent unused timeshares on behalf of its clients.  The caller explained that WAB had a list of tenants lined up to rent Witness 3's timeshare.  The WAB employee guaranteed that Witness 3's timeshare would be rented each year, for three years with guaranteed total earnings of $9,000.00.  WAB required Witness 3 to send WAB a $2,899.00 check in exchange for its services.   The WAB employee guaranteed Witness 3 would earn $4,800.00 within 180 days or WAB would issue Witness 3 a full refund.  Witness 3 did not recall speaking to any other persons during the call and did not enter into a verbal contract or receive a written contract.

32.    Witness 3 mailed a $2,899.00 check to WAB at 199 Dorado Avenue on or about August 4, 2017.

33.     After several months, Witness 3 had not received any of the funds WAB had guaranteed he would receive.  Witness 3 called WAB's office multiple times in an effort to get an explanation as to why he had not received any money. Six months after sending the payment to WAB, Witness 3 spoke with O'Hanlon by phone.  O'Hanlon told Witness 3 that WAB did not make payments to him because of hurricane conditions in Florida, which caused problems in the entire timeshare market.  During that call, O'Hanlon provided

Witness 3 with O'Hanlon's cellular telephone number.  Thereafter, Witness 3 began calling O'Hanlon directly.  After several more months of not receiving money from WAB, Witness 3 told O'Hanlon that he wanted a contract.  O'Hanlon repeatedly promised to mail one, however, Witness 3 never received a contract from O'Hanlon or WAB.

34.     Witness 3 eventually requested that O'Hanlon refund his money.  On numerous occasions, O'Hanlon promised to send Witness 3 a refund, even stating that a check was in the mail.  Witness 3 never received a check and told O'Hanlon that he was going to drive to O'Hanlon's office to pick up the check in person.  O'Hanlon provided numerous reasons why it was not a good idea for Witness 3 to come to WAB's office, including that WAB was relocating offices and that no one was in the office to write the refund check.

35.     On or about March 23, 2018, Witness 3 went to O'Hanlon's office at 199 Dorado Avenue in an effort to receive a refund.  Witness 3 entered 199 Dorado Avenue through the garage and then went into the basement, where WAB's office is located.  Witness 3 described WAB's office as resembling a "bookie" operation, with many phones and desks.  O'Hanlon wrote Witness 3 a refund check, which Witness 3 immediately deposited.

36.     Notably, during an April 17, 2019 interview with law enforcement, O'Hanlon initially denied that any WAB customers had ever come to 199 Dorado Avenue to demand a refund in person.

37.     Based on law enforcement's interviews of victims, the only victims who received money back from WAB were the victims who repeatedly

demanded to receive refunds.  Similarly, O'Hanlon told law enforcement that WAB would only provide refunds to customers who requested refunds as opposed to voluntarily providing refunds for failing to perform promised services.

**APRIL 17, 2019 SEARCH**

38.     On April 17, 2019, a search warrant was executed at 199 Dorado Avenue, pursuant to a search warrant issued in the District of New Jersey on April 15, 2019.

39.     During the execution of the search warrant, agents executing the search warrant found, *inter alia*, $35,400.00 in United States currency in the attic of 199 Dorado Avenue.  The $35,400.00 in United States currency was hidden under insulation on the side of the residence furthest from the attic entrance.

40.     The Defendant Property was contained in one large Citizens Bank envelope.  The large Citizens Bank envelope held five separate TD Bank envelopes, which each held $3,000; $3,600, $5,000, $2,000, and $5,000 respectively.  The remainder of the U.S. currency in the Citizens Bank envelope was in four stacks of $1,000, each stack of $1,000 banded in $1,000 currency wrappers, and in six stacks of $2,000, each stack of $2,000 banded in $2,000 currency wrappers.  The TD Bank envelopes and bundled currency did not appear to be weathered or distressed.  In fact, one of the TD Bank envelopes was dated June 29, 2018, and one of the papers in the Citizen Bank envelope had the date "July 28, 2018" written on it.

41.    O'Hanlon was interviewed while federal search warrants were executed at his residence and office.  During the interview O'Hanlon asked the agents why his money was being taken.  Notably, O'Hanlon did not claim the money belonged to his father Harold O'Hanlon.

42.    During the execution of the search warrant, O'Hanlon claimed that renting out timeshares is impossible, as no one is able rent or sell timeshares. O'Hanlon also claimed to law enforcement that WAB's clients are forgetful and easily confused.

**FINANCIAL ANALYSIS – WAB**

43.    O'Hanlon and Stefanowski hold numerous bank accounts, either in Stefanowski's name, or in the name of WAB.  From approximately October 2017 to April 2019, O'Hanlon and Stefanowski were signatories on bank accounts held in WAB's name at Santander Bank, Parke Bank, and Wells Fargo Bank.  Currently, O'Hanlon only holds accounts at TD Bank.  O'Hanlon and Stefanowski are the only signers on WAB's accounts.

44.    A review of all WAB's bank accounts during the period from October 2016 through April 2019 showed total deposits of approximately $6,266,843.  Of those deposits, approximately $5,292,079 were from WAB victims.  The remaining deposits of approximately $974,764 were derived from transfers between WAB's accounts, purchase refunds, and cash.

45.    A review of WAB's bank records indicate that the vast majority of WAB's business receipts are derived from individuals from across the United States.  In general, the investigation has revealed that O'Hanlon received

payments from clients by personal check.  These personal checks, for the most part, were created by Stefanowski and lack the clients' signatures.

46.     Aside from victim money and inter-account transfers, there were no other known sources of income into the WAB accounts during the operation of the advance fee scheme—from October 2016 to April 2019.

47.     The investigation revealed that O'Hanlon has no reported wages for the period of January 2016 to present, indicating that he had no source of income aside from the advanced fee scheme. Stefanowski has no reported wages from October 2018 to present.  Stefanowski received taxable wages of $45,864.74 for 2016, $49,536.33 for 2017, and $13,008.60 for 2018 from Hale Trailer.

48.     O'Hanlon and Stefanowski did not have a significant assets prior to the beginning of the advance fee scheme. Prior to the beginning of the advance fee scheme, Stefanowski had balances of $155 and $1,266 in her Santander Bank accounts as of December 6, 2015, and bank accounts belonging to O'Hanlon prior to the opening of the WAB accounts have not been identified.

49.     From October 2018 to April 2019, WAB specifically made over $1,430,225 from timeshare victims.  Less than half of the funds WAB received during the course of the advance fee scheme came from victims of the credit recovery scheme.

50.     Analysis of WAB's bank accounts shows a significant volume of cash withdrawals from accounts held in the name of WAB.  Table 1 illustrates the cash activity in each of WAB's operating accounts for the review period

indicating cash deposits of $40,206 and cash withdrawals of $1,045,658 from the WAB accounts controlled by O'Hanlon and Stefanowski.

**TABLE 1**

| Account Holder | Bank | Account Number | Cash In | Cash Out | Net |
|---|---|---|---|---|---|
| WAB | Parke Bank | 6538 | $10,899 | $130,897 | $119,998 |
| WAB | Parke Bank | 6134 | $10,000 | $43,288 | $33,288 |
| WAB | Santander | 1115 | $1,306 | $563,650 | $562,344 |
| WAB | Santander | 4771 | $1 | $73,644 | $73,643 |
| WAB | TD Bank | 2043 | $7,000 | $156,697 | $149,697 |
| WAB | Wells Fargo | 3361 | $11,000 | $77,432 | $66,432 |
| WAB | Wells Fargo | 4354 | $0 | $50 | $50 |
| | Total | | $40,206 | $1,045,658 | $1,005,452 |

51.     The ATM withdrawals from WAB accounts usually ranged from $40 to $503 and cash withdrawals from WAB accounts usually ranged in the amount of $1,000 to $15,000.

52.     Checks totaling $162,835 were made payable to O'Hanlon and drawn on WAB accounts, and Checks totaling $166,660 were made payable to Stefanowski and drawn on WAB accounts.

53.     As shown in Table 2 below, review of the activity in WAB bank accounts based on records from October 2016 to April 2019 revealed a pattern of transactions conducted with cash, payments to O'Hanlon, Harold O'Hanlon, and Stefanowski.

**TABLE 2**

| Acct. Holder | Bank | Cash Withdrawals | Payments to O'Hanlon | Payments to Harold O'Hanlon | Payments to Stefanowski | Cash Deposits | Total |
|---|---|---|---|---|---|---|---|
| WAB | Santander Bank | $637,294 | $4,500 | $6,541 | $9,000 | ($1,307) | $656,028 |
| WAB | Parke Bank | $174,185 | $14,137 | $2,600 | $21,000 | ($20,899) | $191,023 |
| WAB | Wells Fargo Bank | $77,482 | $12,500 | $7,289 | $15,000 | ($11,000) | $101,271 |
| WAB | TD Bank | $156,697 | $105,858 | $18,884 | $121,660 | ($7,000) | $396,099 |
| | **Total** | **$1,045,658** | **$136,995** | **$35,314** | **$166,660** | **($40,206)** | **$1,344,421** |

54.     Bank records show that O'Hanlon engaged in a pattern of cash withdrawals from accounts that he controlled. Between October 2016 and April 2019, over $1 million in cash, specifically $1,045,658, was withdrawn from Santander Bank, Parke Bank, Wells Fargo Bank, and TD Bank.  As stated above, the investigation has revealed that between May 5, 2016 and the time of the execution of the search warrant, O'Hanlon had no source of income aside from the advance fee scheme.  At the time of the execution of the search warrant at O'Hanlon's home on April 17, 2019, the Federal Bureau of Investigation seized $35,400 in United States currency from O'Hanlon's home. Based upon O'Hanlon and Stefanowski's pattern of cash withdrawals and lack of other sources of income, the U.S. currency seized from his home at the time of the execution of the search warrant at his home, was proceeds O'Hanlon obtained, directly or indirectly, from the advance fee scheme.

**FINANCIAL ANALYSIS – HAROLD O'HANLON**

55.    During the course of the advance fee scheme, Harold O'Hanlon held two bank accounts at Investors Bank.

56.    Harold O'Hanlon and his daughter Susan Knoeller are the only signatories on the Investors Bank accounts held in Harold O'Hanlon's name.

57.    An analysis of Harold O'Hanlon's Investors Bank Account ending in 9307 showed four deposits from victims of WAB's advance fee scheme. Some of the victim checks deposited into Harold O'Hanlon's account were payable to Harold O'Hanlon and half of the victim checks deposited into Harold O'Hanlon's account had memos noting collections or timeshares.

58.    Analysis of Harold O'Hanlon's Investors Bank account ending in 9307 showed direct deposits from the Social Security Administration, along with regular deposits of checks  from three sources: investment companies, payroll checks from Camden County Community College, and interest from Investors Bank.

59.     Analysis of Harold O'Hanlon's Investors Bank account ending in 9307 showed two expenditures for $2,500 and $2,078 from the account for what appears to be rent related to office space leased by WAB.  WAB's operating account made monthly payments to the same entities.

60.    From January 2016 to April 2018, only $11,582 was withdrawn in cash from Harold O'Hanlon's Investors Bank account ending in 9307.  The cash withdrawals from Harold O'Hanlon's Investors Bank account ending in

9307 were generally in the amount of $200 or $500, with only two larger cash withdrawals of $1,600 and $2,500.

61.    The below table illustrates the financial transactions between Harold O'Hanlon and each of WAB's operating accounts for the review period indicating that Harold O'Hanlon made one deposit of $3,000 into a WAB account and deposited checks totaling $38,314 drawn on WAB accounts.

**TABLE 3**

| Account Holder | Bank | Account Number | Payments from Harold O'Hanlon | Payments to Harold O'Hanlon | Net |
|---|---|---|---|---|---|
| WAB | Parke Bank | 6538 | $0 | $2,600 | $2,600 |
| WAB | Parke Bank | 6134 | $0 | $0 | $0 |
| WAB | Santander | 1115 | $3,000 | $9,000 | $6,000 |
| WAB | Santander | 4771 | $0 | $541 | $541 |
| WAB | TD Bank | 2043 | $0 | $18,884 | $18,884 |
| WAB | Wells Fargo | 3361 | $0 | $7,289 | $7,289 |
| WAB | Wells Fargo | 4354 | 0 | $0 | $0 |
| | Total | | $3,000 | $38,314 | $35,314 |

62.    Harold O'Hanlon's second account at Investors Bank, ending in 3383 did not receive any deposits during the course of the advanced fee scheme, and no cash withdrawals from the account ending in 3383 occurred during the course of the advance fee scheme.  The only activity in the account ending in 3383 was that it accrued interest from Investors Bank and periodically made transfers to Harold O'Hanlon's Investors Bank account ending in 9307.

63.    Department of Labor records indicate since WAB opened in 2015 to the present, the only reported wages for Harold O'Hanlon are derived from his

job at Camden County Community College.  As a result of his employment, Harold O'Hanlon has taxable wages of $14,658 for 2016, $17,384 for 2017, $12,482 for 2018, and $2,508 through the first two quarters of 2019.

 **The Claim**

64.    On or about July 18, 2019, Harold O'Hanlon, through counsel, filed a claim to the Defendant Property.

65.    The claim alleges that Harold O'Hanlon maintains some of his savings in the form of cash, and that he stores such cash savings at his home located at 199 Dorado Avenue.  The claim further alleges that Harold O'Hanlon, does not fully trust banks.  Harold O'Hanlon made this claim despite being a professor of business, and despite holding two bank accounts.

66.    The claim alleges that the Defendant Property are funds accumulated over the past several years from social security payments, salary from his part-time position as a college professor, and payments from pension plans.

## CLAIM FOR FORFEITURE

67.    The allegations contained in paragraphs 1 through 66 of this Complaint are incorporated herein and made part hereof.

68.    The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984, as property constituting or derived from proceeds traceable to mail fraud, in violation of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. §§ 371 and 1349.

69.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting specified unlawful activity (as defined in Section 1956(c)(7) of [title 18]), or a conspiracy to commit such offense, is subject to forfeiture to the United States."

70.     For purposes of Section 981(a)(1)(C), "specified unlawful activity" includes mail fraud in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

WHEREFORE, the United States of America requests that the Clerk of the Court issue a warrant for the arrest and seizure of the Defendant Property pursuant to Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, which the plaintiff will execute upon the Defendant Property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c); that notice of this action be given to all persons who reasonably appear to be potential claimants to the Defendant Property; that the Defendant Property be forfeited and condemned to the United States of America; that the plaintiff be awarded its costs and disbursements in this action; and that the Court grant such other and further relief it deems just and proper.

Dated:  Newark, New Jersey
        October 16, 2019

                                CRAIG CARPENITO
                                United States Attorney

-21-

_s/ Sarah A. Devlin_
By: SARAH A. DEVLIN
Assistant United States Attorney

# **VERIFICATION**

I, Michael T. Poulton, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that, as to those matters herein stated to be alleged on information and belief, I believe them to be true.

The sources of my knowledge and the grounds of my belief include the official files and records of the United States, information supplied to me by other law enforcement officers, and my own investigation of this case.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Dated this 16th day of October, 2019.


Michael T. Poulton, Special Agent
Federal Bureau of Investigation

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

UNITED STATES OF AMERICA

**(b)**  County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)**  Attorneys *(Firm Name, Address, Email and Telephone Number)*
AUSA Sarah Devlin, U.S. Attorney's Office, 970 Broad Street, 7th Floor, Newark, NJ 07102; sarah.devlin3@usdoj.gov; 973-645-2740

## DEFENDANTS

$35,400.00 IN UNITED STATES CURRENCY, Defendant in rem.

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
       Plaintiff

☐ 2   U.S. Government
       Defendant

☐ 3   Federal Question
       *(U.S. Government Not a Party)*

☐ 4   Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                            *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     Another District
     *(specify)*

☐ 6  Multidistrict
     Litigation -
     Transfer

☐ 8  Multidistrict
     Litigation -
     Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 981
Brief description of cause:
civil forfeiture of criminal proceeds

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☐ Yes   ☒ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____   DOCKET NUMBER _____

DATE
10/16/2019

SIGNATURE OF ATTORNEY OF RECORD
s/ Sarah Devlin

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

2019V00585/DC/SD/fk
CRAIG CARPENITO
UNITED STATES ATTORNEY
BY:   SARAH DEVLIN
ASSISTANT UNITED STATES ATTORNEYS
970 BROAD STREET, SUITE 700
NEWARK, NEW JERSEY 07102
TEL:  (973) 645-2740
FAX: (973) 297.2042
sarah.devlin3@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Hon.** |
| **Plaintiff,** | : | **Civil Action No. 19-** |
| **v.** | : | |
| **$35,400.00 IN UNITED STATES CURRENCY** | : | **WARRANT FOR ARREST _IN REM_** |
| | : | |
| **Defendant _in rem._** | : | |

## TO ANY OFFICER OF THE UNITED STATES DEPARTMENT OF JUSTICE, THE FEDERAL BUREAU OF INVESTIGATION, AND/OR ANY OTHER DULY AUTHORIZED LAW ENFORCEMENT OFFICER:

WHEREAS, a Verified Complaint for Forfeiture _in Rem_ has been filed on October 16, 2019, in the United States District Court for the District of New Jersey, alleging that the defendant property, namely $35,400.00 in United States currency is subject to seizure and forfeiture to the United States for the reasons set forth in the Complaint;

WHEREAS, the defendant property is currently in the possession, custody, or control of the United States;

WHEREAS, in these circumstances, Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure (the "Supplemental Rules"), directs the Clerk of the Court to issue a Warrant for Arrest *in Rem* for the defendant property; and

WHEREAS, Rule G(3)(c)(i) of the Supplemental Rules provides that the Warrant for Arrest *in Rem* must be delivered to a person or organization authorized to execute it, who may be an agent with the United States Department of Justice or any other United States officer or employee; someone under contract with the United States; or someone specially appointed by the court for that purpose.

YOU ARE, THEREFORE, HEREBY COMMANDED to take such steps as are necessary to arrest and detain the defendant property, including, if appropriate, serving a copy of this warrant on the custodian in whose possession, custody, or control the property is currently found; and

YOU ARE FURTHER COMMANDED to use whatever means may be appropriate to protect and maintain the defendant property in your custody until further order of this Court.

IN WITNESS WHEREOF, I, the Clerk of the United States District Court for the District of New Jersey, have caused the foregoing Warrant for Arrest *In Rem* to be issued pursuant to Rule G(3)(b)(i) of the Supplemental Rules.


Dated: _____          _____
                                Clerk of the Court


                         By: _____
                                Deputy Clerk


-2-